STATE OF MAINE
PENOBSCOT, SS.

DISTRICT COURT
BANGOR
CIVIL ACTION
Docket No. BAN-CV-03-368

Jay McLaughlin,
     Plaintiff

FILED & ENTERED
SUPERIOR COURT

JUL 07 2005

PENOBSCOT COUNTY

v.

Decision and Judgment

Southworth-Milton, Inc.
     Defendant

     Hearing on the complaint and counterclaim was held on January 24 and 25, 2005. Both parties were present with counsel. Subsequent to the trial, the parties filed written argument, which the court has considered. The parties' claims in this action focus on a transaction involving a Caterpillar 320C Forest Machine, which is a delimber used in logging operations. The essential question in the case is whether the parties entered into a contract for the purchase and sale of that machinery. The plaintiff, Jay McLaughlin, contends they did not and that the defendant, Southworth-Milton, Inc. (SMI) is therefore liable to him, first, for converting, through an auction sale, a piece of equipment that, had there been a contract, would have constituted a trade-in; and, second, for lost profits he claims were caused by the loss of use of the putative trade-in. SMI, on the other hand, maintains that the parties entered into a contract for the sale of the forest machine, that its actions represented remedial steps authorized because McLaughlin breached that contract, and that McLaughlin is liable for a deficiency on the contract price.

     In October 2002, McLaughlin and Jeff Fogg, a sales representative for SMI, began negotiations for a transaction under which SMI would sell a new Forest Machine to McLaughlin. On November 7, Fogg submitted a proposed purchase order to McLaughlin that included a net purchase price of $206,325. *See* plaintiff's exhibit 2. This price accounted for a trade-in credit of $62,000 for a 1995 delimber that

1

McLaughlin had purchased used from SMI several years earlier. This price excluded the cost of a fire suppression system that McLaughlin told Fogg he did not want; this allowed a reduction in the price that the parties had discussed earlier. The purchase order specified that the Forest Machine would be equipped with a bar and chain top saw, and with a butt saw. By prior arrangement between the parties, SMI arranged to have this machine delivered to McLaughlin's jobsite in Rumford. When the machine was delivered to McLaughlin, the transporter picked up McLaughlin's trade-in delimber and returned it to SMI's Brewer facility. The parties dispute whether SMI brought the Forest Machine to McLaughlin for him to use on a demonstration basis. Fogg's denial of a trial period is brought into question by his past statements to the contrary.[1] Ultimately, the court concludes that, at least initially, there was a demonstration period when McLaughlin could use the new Forest Machine to see if it met his needs and make sure that it worked properly. Although SMI provided the Forest Machine to Fogg on this provisional basis, SMI nonetheless took possession of the prospective trade-in to save the need for a separate trip if the sale were finalized. (If the deal were to fall through, then SMI would have to go back to Rumford anyway to retrieve the Forest Machine and, as part of that trip, could return the trade-in to McLaughlin.)

Sometime later, in mid-November, Fogg visited McLaughlin at the Rumford site. McLaughlin told Fogg that he wanted changes in some of the Forest Machine features: he wanted a radio; he did not want the butt saw; and he wanted to reduce the size of the motor that controls the boom on the delimber. Fogg agreed to add a radio without charge to McLaughlin, and, after consulting with the manufacturer, Fogg reduced the total price by $10,000 to account for the exclusion of the butt saw. He also agreed to change the motor for the boom.

These discussions led Fogg to write up a new purchase order. See plaintiff's exhibit 4. This document provides for the radio and eliminates the fire suppression system. Although not set out expressly, the price reduction from the earlier proposed purchase order demonstrates that the boom saw was no longer part of the deal. Finally, although the purchase order does not make any provision regarding the change in the size

---

[1] As is noted in these factual findings, the credibility of both central witnesses, McLaughlin and Fogg, do not emerge from this proceeding unscathed.

of the boom motor that McLaughlin requested, Fogg recognized at trial that the parties agreed to this adjustment. Further, in addition to covering the terms of the prospective sale of the Forest Machine, the purchase order reflects some arrangements that derived from an earlier transaction between the parties. In 2000, McLaughlin purchased an excavator from SMI. As part of the sale terms, SMI gave McLaughlin a $6,000 credit that he could use to rent equipment from SMI. (This term was included in the 2000 sales contract because the parties had differing opinions about the value of a trade-in. Rather than adjusting the net sales price, the parties reached this accommodation.) As of November 2002, McLaughlin still had not drawn on this $6,000 credit, and Fogg agreed to include it as a provision of the contract. Additionally, the excavator that McLaughlin purchased in 2000 had a leak in its engine. SMI previously had agreed to repair the problem but had not done so by November 2002. As part of the agreement for the sale of the Forest Machine, Fogg reiterated SMI's agreement to perform the repair work. Fogg himself added notations of these terms on the purchase order. Although these two terms were included in the November 2002 purchase order for the sale of the Forest Machine, they represented agreements that were already in place and the SMI would be bound to honor irrespective of whether it entered into a contract for the sale of the Forest Machine.

Both Fogg (on SMI's behalf) and McLaughlin signed this purchase order, which identified McLaughlin as "PURCHASER" and SMI as "SELLER," and which also stated that the machine was "SOLD TO" McLaughlin. McLaughlin testified that when he signed it, the purchase order did not set out the amount of the purchase price. The court does not find this to be credible. The evidence more reasonably suggests that McLaughlin, who appears to be an astute businessman, would not have signed a purchase agreement if it lacked information as basic as the sales price. McLaughlin testified that he would not have signed the purchase order if it did not set out the provisions confirming the $6,000 rental credit and SMI's agreement to repair the engine leak. If McLaughlin were sufficiently concerned about the completeness of the written instrument to ensure that these terms were included in it, then the court can only conclude that he would not have signed a purchase order that did not specify the price. Thus, the court finds that when he signed it, it contained all of the writing shown on plaintiff's exhibit 4. These written terms constitute the essential elements of the parties' agreement,

3

and the writing goes a long way toward establishing that the parties in fact entered into an enforceable contract for the sale of the Forest Machine.

The parties had agreed that McLaughlin would obtain financing from Caterpillar Financial Services Corporation, which provides financing for purchases of Caterpillar equipment. Caterpillar Financial received McLaughlin's loan application on November 11, *see* plaintiff's exhibit 2A (the "For Office Use Only" portion of the purchase order form relates to financing aspects of the transaction), and it subsequently approved him for the financing that the parties had contemplated.[2] In December 2002, Caterpillar Financial forwarded to McLaughlin the financing documents. Rather than signing the documents in their original form, McLaughlin signed the note but added the following language:

> To go into Effect after
> 320 oil leak fixed
> Rental used
> Hy [hydraulic] motor changed

*See* plaintiff's exhibit 5. Caterpillar Financial received these altered documents on December 20. Refusing to accept them with the modifications made by McLaughlin, Caterpillar Financial sent McLaughlin another set of financing documents. McLaughlin never executed them.

In the meantime, on December 17, McLaughlin delivered to SMI's Brewer's repair facility the excavator that he had purchased in 2000. The repair invoice recites that work was performed to repair the engine oil cooler. *See* plaintiff's exhibit 7. Although McLaughlin disputes that SMI repaired the leak that SMI had agreed to fix, McLaughlin never advised SMI that the repair work was ineffective. Rather, the better evidence suggests that during that December service, SMI in fact addressed the problem as it agreed to do pursuant both to the 2002 purchase order and to its previous promise.

---

[2] As is noted above in the text, the parties adjusted the contract subsequent to November 11, because Foss met with McLaughlin after that date. This latter meeting is when McLaughlin requested changes in the features of the Forest Machine, resulting in a change in the price. These post-November 11 adjustments are reflected in changes in the price calculations on plaintiff's exhibit 2A. On that exhibit, these changes were made by the Caterpillar Financial representative who was involved in this deal. Those changes in the final purchase price did not affect the lending decision.

As of January 2002, McLaughlin still had not executed the financing documents associated with his purchase of the Forest Machine. Nonetheless, that month, SMI proceeded to sell the delimber that it had acquired from McLaughlin in trade. *See* plaintiff's exhibits 9-11. The SMI employee who supervised the auction, Peter Collins, was unaware that the financing instruments associated with the underlying sale remained outstanding. The sale price was roughly $42,000, although SMI had allowed $62,000 for the trade-in. McLaughlin was unaware of the disposition of the trade-in until after the fact. However, he still had possession of the new Forest Machine and continued to use it.

By April 2003, McLaughlin had possessed the Forest Machine and used it for five months, and he had not made any payments toward it. McLaughlin met with SMI representatives, who demanded that he sign the financing instruments. McLaughlin refused to do so, advising SMI's representatives that he wanted the changes to the Forest Machine to be made by Caterpillar at the factory, rather than have SMI make the modifications to which the parties had agreed during the discussions between Fogg and him in November. This is the first time he had made such a demand to SMI. The meeting ended when McLaughlin walked out. In light of these circumstances, SMI reasonably concluded that McLaughlin was not going to abide by the agreement that the parties had reached for the sale of the Forest Machine.

Shortly after the meeting, SMI sent McLaughlin a notice of default. *See* plaintiff's exhibit 12. On April 22, four days after SMI sent the notice to McLaughlin, McLaughlin returned the Forest Machine to SMI at its Brewer site. Although McLaughlin insisted at trial that he returned the machine to SMI prior to his receipt of the notice of default, the best evidence of this sequence suggests the contrary. In the ordinary course of its business, SMI created a receipt indicating that McLaughlin surrendered the Forest Machine on April 22. *See* plaintiff's exhibit 13. This is the best available evidence of the date when McLaughlin returned the Forest Machine to SMI. This date reveals the four-day span between the date of the notice of default and McLaughlin's return of the machine. Further, McLaughlin testified that he received the April 18 notice of default on April 21, which is the day before the machine was returned to SMI, according to the company's receipt. This amount of time, combined with the

nature of these events themselves, indicates that McLaughlin probably returned the machine to SMI in response to the notice.

McLaughlin failed to cure the default arising from his failure to make payments toward the purchase of the Forest Machine. SMI scheduled a public auction of the Forest Machine and notified McLaughlin of that course. *See* plaintiff's exhibits 14-15. Three people, including McLaughlin, attended the auction. During the auction process, McLaughlin stated that the hour gauge was inaccurate and that he had run the machine for many more hours more than the gauge showed, which was 710 hours. *See* plaintiff's exhibit 16. Despite McLaughlin's testimony that SMI did not accept any bids, in fact as a result of the auction, SMI sold the Forest Machine for $165,000, leaving a deficiency of $21,500 based on the sales price to McLaughlin.

The dispositive question on the parties' respective claims is whether they entered into an enforceable contract under which McLaughlin was bound to purchase the Forest Machine from SMI.

> To establish a legally binding agreement the parties must have mutually assented to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties. . . .For a contract to be enforceable, the parties thereto must have a distinct and common intention which is communicated by each party to the other.

*Searles v. Trustees of St. Joseph's College*, 1997 ME 128, ¶ 13, 695 A.2d 1206, 1211 (citations and internal punctuation omitted).

The court concludes that the parties formed a contract for the purchase and sale of the Forest Machine. McLaughlin and Fogg mutually assented to the terms of the transaction. This mutual assent is demonstrated in a significant way by the purchase order that they both signed in mid-November. The purchase order set out the features of the Forest Machine that McLaughlin wanted the equipment to have. If also specified the purchase price. By signing it, McLaughlin characterized himself as the "purchaser" and that the Forest Machine would be "sold to" him. By any objective measure, McLaughlin's written endorsement had the consequence of casting him as a party to a defined agreement.

By virtue of industry custom known to both McLaughlin and Fogg, the transaction was subject to a trial or demonstration period. In fact, McLaughlin had the benefit of demonstration use for approximately ten days or more prior to the time he signed the purchase order. McLaughlin argues that despite signing the purchase order, he never finalized an agreement with SMI and that he continued to use the Forest Machine solely as a demonstration. This contention is neither reasonable nor supported by the evidence. First, this argument is undermined by his willingness to sign the purchase order following a meaningful amount of time he had to try out he machine. Second, when he signed the purchase order, he requested changes only in some particular features of the machine but wanted to keep the basic machine itself, subject to those modifications.

Third, SMI had Caterpillar building the subject Forest Machine pursuant to McLaughlin's initial specifications. McLaughlin later changed some of those features he wanted, and SMI agreed to make arrangements to effect those changes. However, the custom nature of the machine that SMI sold to McLaughlin makes its highly unlikely that it advised McLaughlin, directly or indirectly, that he could use the machine for the length McLaughlin suggests here or that it suggested, directly or indirectly, that the transaction was anything other than a sale. This evidence also undermines McLaughlin's contention that Fogg told him that he (Fogg) would get a different Forest Machine, which was located in Fort Kent, to meet McLaughlin's newest request. Rather, that reference is better explained as a remark, perhaps motivated by exasperation, by Fogg that if McLaughlin had been more certain about his wishes in the first instance, SMI could have obtained a machine that met those requirements from existing inventory rather than commissioning a new one.

Fourth, the financing office associated with SMI sent McLaughlin two sets of instruments that would generate the purchase money for the Forest Machine. McLaughlin altered the first promissory note, and, in response, Caterpillar Financial Services sent him a clean duplicate. Fully aware that he had signed a purchase order for the machine, McLaughlin's receipt of the two promissory notes for the amount specified in the purchase order put him on plain notice that his possession of the machine was the

product of a sale and that McLaughlin was not using the machine on a demonstration basis.

McLaughlin also argues that the contract was not validly formed because it never received the approval it needed from Fogg's supervisor, Dennis Taylor. For purposes of the analysis of this issue, the court will assume that the evidence shows that Taylor rejected the two conditions precedent sought by McLaughlin: that before he entered into the contract for the sale of the Forest Machine, first, he would use the $6,000 rental credit that arose from the 2000 transaction, and, second, SMI would repair the engine leak in McLaughlin's excavator.[3] For two separate reasons, Taylor's rejection of these proposed terms does not defeat the existence of the contract.

First, there is no persuasive evidence that McLaughlin was aware that Taylor's approval of the agreement was necessary in order to bind SMI. As far as McLaughlin knew, Fogg had full authority to enter into the sales contract on behalf of SMI, and Fogg agreed to the two terms at issue here. Fogg clearly had apparent authority to act for SMI. A principal "creates apparent authority 'by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'" *Steelstone Industries, Inc. v. North Ridge Limited Partnership*, 1999 ME 132, ¶ 13, 735 A.2d 980, 983, *quoting* RESTATEMENT (SECOND) OF AGENCY § 27 (1958). Such is the case here. SMI placed Fogg in the field to negotiate transactions such as the one in issue here with prospective buyers such as McLaughlin, who in fact had had prior sales dealings with Fogg on behalf of SMI. SMI created the appearance that it had vested in Fogg its authority to consummate sales of logging equipment. When a principal is disclosed, as it was here, and an agent acting within the scope of his apparent authority enters into a contract with another, the other party is bound by the contract even if the

---

[3] These factual contentions are not free of question. On the first point, as is discussed above, in December SMI performed the repairs that McLaughlin requested. On the second, Taylor testified that he thought that McLaughlin had already received the $6,000 rental credit from the 2000 deal and that it should not be reiterated in the 2002 purchase order. However, it appears that Taylor was getting his information from another SMI employee, Peter Collins, who told Taylor that McLaughlin had not yet received that rental credit. Thus, the state of Taylor's knowledge is not entirely clear, despite his testimony.

agent did not have *actual* authority to enter into the contract for the principal. *See* RESTATEMENT (SECOND) OF AGENCY § 292, cmt. a (1958). Therefore, even if Taylor failed to assent to the conditions sought by McLaughlin, McLaughlin is bound by the terms of the contract to which he and Fogg agreed.

McLaughlin appears to argue that the form provisions of the purchase and sale agreement required Taylor's approval of the terms of the transaction, as a condition to the formation of a contract. Paragraph 3 of the "Terms and Conditions" incorporated into the purchase order, *see* plaintiff's exhibit 22, is a time-based limitation on the authority of the buyer (here, McLaughlin) to revoke an offer to buy the subject matter of the prospective sale. It is silent on the process internal to SMI and does not otherwise identify the actions that SMI takes in order to finalize its acceptance. Here, Fogg signed the purchase order. As is discussed in the preceding paragraph, that act, in the context of his dealings with McLaughlin, was sufficient to manifest SMI's full acceptance of the terms of this sale.

Second, the two conditions that McLaughlin pressed were already part of his contractual relationship with SMI. As it previously agreed to do,[4] SMI performed the engine repair in December, thereby satisfying this issue. And pursuant to the 2000 transaction between the parties, SMI was already contractually obligated to provide McLaughlin with rental consideration worth $6,000. McLaughlin needed only to invoke that benefit. He contends here that he agreed with Fogg that the contracted sale of the Forest Machine would be effective only when he used that credit. The court rejects this notion, however, because it would amount to an open-ended situation where McLaughlin would remain in possession of the Forest Machine indefinitely until he unilaterally chose to use and exhaust the rental credit. At most, McLaughlin's argument is limited to a contention that he insisted on two contractual terms beyond what SMI agreed. However, SMI either performed or was bound to perform these two obligations irrespective of whether the parties entered into the 2002 agreement. Therefore, the parties reached a meeting of the minds on those terms. Whether that agreement was in one setting (the

---

[4] The existence of SMI's independent obligation to repair the engine leak is manifested by McLaughlin's own conduct. SMI made the repair at a time when McLaughlin now contends the 2002 contract was not in effect. SMI's obligation to make the repair therefore must have derived from some other source, based on McLaughlin's own argument here. That source could only have been a prior agreement.

9

2002 contract) or in two settings (the 2000 contract and the 2002 contract), the end result is the same.

For the reasons noted above, the court has found that the parties formed an enforceable agreement for the sale of the Forest Machine with the features that McLaughlin specified to Fogg at the time they executed the purchase order. The record does not make express that SMI implemented the changes that McLaughlin directed. For purposes of this analysis, the court assumes that SMI in fact did not do so. The resulting question is whether McLaughlin was justified in refusing to pay SMI for the machine (or, stated more precisely, whether he was entitled not to execute the financing documents) because of SMI's assumed failure to make the modifications reflected in the parties' contract. The answer to this question depends on whether SMI's failure to make the requested changes is a total (material) or partial (non-material) breach of its obligations under the contract. This determination is a question of fact. *See Jenkins, Inc. v. Walsh Brothers, Inc.*, 2001 ME 98, ¶ 13, 776 A.2d 1229, 1234.

> A total breach of a contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end. If the breach is not sufficiently material and important for this, the breach is called a partial breach. . . .If a party elects to treat the breach as partial, however, it must still perform its obligations in order for it to avoid also breaching the contract. . . .("A partial breach by one party, however, does not justify the other party's subsequent failure to perform.").

*Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417, 421 (citations and internal punctuation omitted).

Any breach of the agreement by SMI was not total and did not reasonably justify McLaughlin in refusing to pay for the Forest Machine, which itself was clearly a total or material breach. The transaction was for the sale of a machine that was worth more than one-quarter of a million dollars. SMI had ordered it from the manufacturer to meet the feature requests that McLaughlin made in the first instance. The items that SMI may have failed to change include the installation of a radio, the removal of a butt saw and the replacement of a boom engine that was actually smaller than the one installed by the manufacturer. First, although it was a feature that McLaughlin wanted, the radio is simply an insignificant component of this machine. Second, if SMI did not remove the butt saw, McLaughlin suffered no prejudice. If anything, he received the benefit of a

10

piece of equipment for which he was not charged. Finally, although the larger original boom engine did not work as quickly as the smaller one that McLaughlin preferred, any disadvantage it created, when viewed in the context of the whole transaction, was not one where he was entitled to conclude that that transaction had collapsed. Any breaches arising from SMI's failure to implement the changes that McLaughlin requested are no more than partial. They may have entitled McLaughlin to some recourse and relief, but they were not a sufficient basis for him to repudiate the contract.

For these reasons, the court concludes that McLaughlin breached the contract between the parties without legal justification. SMI was entitled to dispose of the trade-in equipment as it did. SMI is not liable for converting that asset.

Further, McLaughlin is liable to SMI for the deficiency of $21,500, which is the difference between the amount that McLaughlin owed from the purchase price and the amount that SMI realized from the auction sale of the collateral.

The entry shall be:

For the foregoing reasons, on the complaint, judgment is entered for the defendant. On the counterclaim, judgment is entered for the defendant (the counterclaim plaintiff) against the plaintiff (the counterclaim defendant) in the amount of $21,500, plus prejudgment interest at the contractual rate of 3.76%, *see* 14 M.R.S.A. § 1602-B(2), and post-judgment interest at the statutory rate of 7.41%. The defendant is awarded its costs of court.

Dated: July 5, 2005

Justice, Maine Superior Court sitting in
Maine District Court
Jeffrey L. Hjelm

11

JAY MCLAUGHLIN - PLAINTIFF
RT 157
MEDWAY ME 04460
Attorney for: JAY MCLAUGHLIN
STEVEN BLACKWELL - RETAINED 08/07/2003
CUDDY & LANHAM
470 EVERGREEN WOODS
BANGOR ME 04401

vs
SOUTHWORTH MILTON INC - DEFENDANT
79 ROBERTSON BLVD
BREWER ME 04412
Attorney for: SOUTHWORTH MILTON INC
JAY OTIS - WITHDRAWN 10/14/2004
PO BOX 907
146 PARKWAY SOUTH SUITE 10
BREWER ME 04412-0907

Attorney for: SOUTHWORTH MILTON INC
JOTHAM PIERCE JR - RETAINED
PIERCE ATWOOD
ONE MONUMENT SQUARE
PORTLAND ME 04101

Attorney for: SOUTHWORTH MILTON INC
GAVIN MCCARTHY - RETAINED
PIERCE ATWOOD
ONE MONUMENT SQUARE
PORTLAND ME 04101

Filing Document: COMPLAINT                Minor Case Type: OTHER CIVIL
Filing Date: 08/07/2003

## Docket Events:

08/08/2003 FILING DOCUMENT - COMPLAINT FILED ON 08/07/2003

08/08/2003 Party(s):  JAY MCLAUGHLIN
          ATTORNEY - RETAINED ENTERED ON 08/07/2003
          Plaintiff's Attorney: STEVEN BLACKWELL

08/21/2003 Party(s):  SOUTHWORTH MILTON INC
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 08/19/2003
          Plaintiff's Attorney:  STEVEN BLACKWELL

08/21/2003 Party(s):  SOUTHWORTH MILTON INC
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 08/08/2003
          ON DEFENDANT, THROUGH C.T. WILLIAM RICHARDSON.

09/04/2003 Party(s):  SOUTHWORTH MILTON INC
          RESPONSIVE PLEADING - ANSWER & AFFIRMATIVE DEFENSE FILED ON 08/28/2003
          Defendant's Attorney: JAY OTIS

09/04/2003 Party(s):  SOUTHWORTH MILTON INC